**2009 BNH 010**

_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                          Bk. No. 05-13724-JMD
                                                                Chapter 11
Felt Manufacturing Co., Inc.,
f/k/a Foss Manufacturing Co, Inc.,
            Debtor


Lawrence E. Rifken,
Plan Administrator and Trustee of the
Felt Manufacturing Co., Inc. Liquidating Trust,
            Plaintiff,


v.                                                              Adv. No. 07-1123-JMD


CapitalSource Finance, LLC,
            Defendant

*Robert J. Feinstein, Esq.*                    *Joseph A. Foster, Esq.*
*Beth E. Levine, Esq.*                         *Cheryl C. Deshaies, Esq.*
*Pachulski, Stang, Ziehl & Jones LLP*          *McLane, Graf, Raulerson & Middleton, P.A.*
*New York, New York*                           *Manchester, New Hampshire*
*Attorneys for Plaintiff*                      *Attorneys for Plaintiff*


*John P. Sieger, Esq.*                         *Charles R. Powell III, Esq.*
*Peter A. Siddiqui, Esq.*                      *Devine, Millimet & Branch, P.A.*
*Katten Muchin Rosenman LLP*                   *Manchester, New Hampshire*
*Chicago, Illinois*                            *Attorney for Defendant*
*Attorneys for Defendant*

## MEMORANDUM OPINION

## I.  INTRODUCTION

This adversary proceeding was filed by Lawrence E. Rifken (the "Plaintiff"), the plan administrator and trustee of a liquidating trust created by the confirmed chapter 11 reorganization plan of Felt Manufacturing Co., Inc. (the "Debtor").  The Plaintiff filed a single-count complaint against CapitalSource Finance, LLC (the "Defendant") seeking to surcharge the Defendant's collateral under § 506(c) of the Bankruptcy Code[1] to pay for fees and costs incurred by professionals for the Debtor and the Official Committee of Unsecured Creditors (the "Committee") during the first several weeks of the Debtor's chapter 11 case.  In response, the Defendant filed a motion to dismiss for failure to state a claim on which relief could be granted (Doc. No. 6) (the "Motion") and it also raised several affirmative defenses.  The Court held a hearing at which both sides presented arguments and the matter was taken under submission.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  MOTION TO DISMISS STANDARD

A motion to dismiss asks the court, at the initial pleading stage, to review the sufficiency of a plaintiff's complaint by determining whether the allegations contained in that complaint are sufficient to state a recognizable cause of action under the applicable law.  The standard under

---

[1]  In this opinion the terms "Bankruptcy Code," "section" and "§" refer to title 11 of United States Code, 11 U.S.C. § 101 et seq., prior to enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8.

which federal courts review motions to dismiss is governed by Federal Rule of Civil Procedure 12(b)(6), made applicable to adversary proceedings in bankruptcy by Federal Rule of Bankruptcy Procedure 7012(b).[2]  Under Rule 12(b)(6), the Court must accept the allegations in the complaint as true and make all reasonable inferences in favor of the plaintiff.  Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007).  A plaintiff has the task of setting forth factual allegations, either direct or inferential, regarding each material element necessary to recover under an actionable legal theory.  Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008).

The Supreme Court recently altered the applicable pleading standard under Rule 12(b)(6) in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007).  This Court has previously discussed at length the recent change in that pleading standard in two opinions, see Notinger v. Costa (In re Robotic Vision Sys., Inc.), 374 B.R. 36 (Bankr. D.N.H. 2007), and Official Comm. of Unsecured Creditors v. Foss (In re Felt Mfg. Co., Inc.), 371 B.R. 589 (Bankr. D.N.H. 2007), and will not repeat an exhaustive analysis.  Suffice it to say that a complaint will now survive a motion to dismiss only if the allegations in the complaint cross the line between mere possibility of relief and allege a plausible entitlement to relief.  Twombly, 127 S. Ct. at 1967; Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007).  Perfection is not required and there is no probability requirement at the pleading stage; the facts need only raise a reasonable expectation that discovery will reveal evidence to support relief.  Twombly, 127 S. Ct. at 1965.  Thus, the complaint must contain enough factual allegations "that raise a right to relief above the

---

[2]  In general the Federal Rules of Civil Procedure are made applicable to this adversary proceeding, with some exceptions and additional provisions, by the Federal Rules of Bankruptcy Procedure.  The Federal Rules of Civil Procedure shall be referred to as "Rule" and the Federal Rules of Bankruptcy Procedure shall be referred to as "Bankruptcy Rule" in this opinion.

speculative level." <u>Gray v. Evercore Restructuring, LLC</u>, 544 F.3d 320, 324 (1st Cir. 2008). This obligation requires more than labels, conclusory statements, or simply reciting the elements of a cause of action. <u>See</u> <u>Twombly</u>, 127 S. Ct. at 1964-65; <u>Rodriguez-Ortiz</u>, 490 F.3d at 95-96. Dismissal is therefore appropriate if the facts fail to establish a claim to relief that is plausible on its face. <u>Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.</u>, 524 F.3d 315, 320 (1st Cir. 2008).

The Defendant also raises affirmative defenses in its motion to dismiss. "While most Rule 12(b)(6) motions are premised on a plaintiff's putative failure to state an actionable claim, such a motion may sometimes be premised on the inevitable success of an affirmative defense. Dismissing a case under Rule 12(b)(6) on the basis of an affirmative defense requires that (i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." <u>Nisselson v. Lernout</u>, 469 F.3d 143, 150 (1st Cir. 2006) (citations omitted), <u>cert. denied</u>, 127 S. Ct. 2131 (2007);[3] <u>Gray</u>, 544 F.3d at 324.

## III. DISCUSSION

This matter involves § 506(c) of the Bankruptcy Code. Section 506(c) provides:

The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

---

[3] The "other allowable sources of information" that a court may review on a motion to dismiss raising affirmative defenses include documents annexed to the complaint, materials "fairly incorporated" into the complaint, i.e., documents referred to in the complaint but not annexed to it, and matters susceptible to judicial notice. <u>Rodi v. Southern New England Sch. of Law</u>, 389 F.3d 5, 12 (1st Cir. 2004).

11 U.S.C. § 506(c).  The general rule is that post-petition administrative expenses and the general costs of reorganizing in bankruptcy cannot be charged against secured collateral.  <u>Gen. Elec. Credit Corp. v. Levin & Weintrub (In re Flagstaff Foodservice Corp.)</u>, 739 F.2d 73, 76 (2d Cir. 1984) ("<u>Flagstaff I</u>").  Section 506(c) is an exception to this general rule where the trustee (or debtor-in-possession) expends funds to preserve or dispose of property securing the debt.  The statute was designed to prevent a windfall to the secured creditor who benefits from the claimant's expenses in preserving or disposing of the secured party's collateral.  <u>See</u> <u>IRS v. Boatmen's First Nat'l Bank</u>, 5 F.3d 1157, 1159 (8th Cir. 1993).

With this background in mind, the Court turns to the Defendant's several bases for dismissal in the Motion.  The Court addresses each in succession.

**A.  Standing and Waiver**

The Defendant first maintains that the Plaintiff is an administrative creditor who does not have standing to bring a § 506(c) claim because the United States Supreme Court held in <u>Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.</u>, 530 U.S. 1 (2000), that only a debtor-in-possession or trustee may seek relief under § 506(c).  The Defendant believes the Plaintiff is an administrative creditor by virtue of an order of the Court in which the appointed chapter 11 trustee (the "Trustee") purportedly waived any rights under § 506(c).[4]  Thus, the Defendant believes the Plaintiff did not succeed to the former Trustee's standing under § 506(c).

---

[4] It is undisputed that the Plaintiff succeeded to the Trustee's rights under the terms of the Third Amended Plan of Liquidation.  <u>See</u> <u>In re Felt Mfg.</u>, Bk. No. 05-13724-JMD, Doc. Nos. 1122 & 1142.  The Defendant is not arguing here that the Plaintiff did not succeed to the Trustee's rights at all but that, before he did, the Trustee waived his own rights to pursue § 506(c) claims when the Court entered a post-petition financing order.  The Defendant raises an alternative argument that the plan failed to assign the right to bring § 506(c) claims to the Plaintiff and res judicata now bars that claim.  The Court deals with that defense below.

Although standing and waiver are generally two separate defenses, they collapse into the same issue under the circumstances in this case.

On January 17, 2006, the Court entered an order in the Debtor's bankruptcy case that authorized the Trustee to obtain post-petition financing from the Defendant. See In re Felt Mfg., Doc. No. 478 (the "Financing Order"). The Financing Order provides in relevant part:

> **Surcharge.** Except for the Carve-Out (as defined below), no costs or administrative expenses that have been or may be incurred in this Chapter 11 Case incurred since November 1, 2005, in any proceedings related hereto . . . and no priority claims are or will be prior to or on a parity with the Superpriority Claim of the [Defendant] for the Post-Petition Debt. In no event shall any costs or expenses of administration incurred since November 1, 2005 be imposed upon the [Defendant] or any of the Collateral pursuant to section . . . 506(c) of the Bankruptcy Code . . . without the prior written consent of the [Defendant], and no such consent shall be implied from any action, inaction or acquiescence by the [Defendant]. Any and all payments or proceeds remitted . . . to the [Defendant] . . . shall be received . . . by the [Defendant] free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on section[] 506(c) . . . of the Bankruptcy Code . . . , which [is] hereby waived by the Chapter 11 Trustee; provided, however, that the foregoing shall not impact any rights the Debtor's professionals or the Committee's professionals may have pursuant to section 506(c) of the Bankruptcy Code relating to actual, reasonable and necessary costs and expenses incurred prior to the appointment of the Chapter 11 Trustee. In consideration of the [Defendant]'s agreement to fund the Wind Down Budget . . . and the [Defendant]'s agreement to make funds available pursuant to the Budget . . . , counsel for the Chapter 11 Trustee and counsel for and consultants to the Committee, . . . waive and release all rights to request that the Chapter 11 Trustee assert on their behalf a claim for administrative costs and expenses incurred since November 1, 2005 under section 506(c) of the Bankruptcy Code against the Pre-Petition Collateral or the Collateral; provided, however, that the foregoing shall not impact any rights the Committee's professionals may have pursuant to section 506(c) of the Bankruptcy Code relating to actual, reasonable and necessary costs and expenses incurred prior to the appointment of the Chapter 11 Trustee.

Financing Order ¶ 10 (emphasis in original). The Financing Order delineates in part the parties' agreement regarding claims for surcharge against the Defendant's collateral. The Court will interpret the order to determine whether the Trustee waived his rights under § 506(c).

6

The First Circuit recognizes the power of a trial court to interpret its own orders.  See
Harvey v. Johanns, 494 F.3d 237, 242 (1st Cir. 2007).  Bankruptcy courts likewise have power to
interpret their own orders.  Concerto Software, Inc. v. Vitaquest Int'l, Inc., 290 B.R. 448, 453
(D. Me. 2003); see Airadigm Communications, Inc. v. FCC (In re Airadigm Communications,
Inc.), 547 F.3d 763, 769 (7th Cir. 2008).  The terms of court orders, plans of reorganizations, and
stipulations between parties are typically examined under principles of contract interpretation.
New Seabury Co. Ltd. Partnership v. New Seabury Prop., LLC (In re New Seabury Co. Ltd.
Partnership), 450 F.3d 24, 33 (1st Cir. 2006); City of Covington v. Covington Landing Ltd.
Partnership, 71 F.3d 1221, 1227 (6th Cir. 1995).  Bankruptcy courts look to state law in
construing and interpreting contracts.  Schott v. WyHy Fed. Credit Union (In re Schott), 282
B.R. 1, 7 (B.A.P. 10th Cir. 2002).  The Court therefore looks to New Hampshire law.

When New Hampshire courts interpret a contract, they give the language its reasonable
meaning, considering the circumstances and context of the agreement, and reading the document
as a whole.  Glick v. Chocorua Forestlands Ltd. Partnership, 157 N.H. 240, 248 (2008).  Absent
any ambiguity, the intent is determined from the plain meaning of the language in the document.
Id.; see Wireman v. IRS (In re Wireman), 364 B.R. 297, 301 (Bankr. N.D. Ohio 2007) ("Courts,
whether interpreting a statute, contract, or their own order, must generally give words and
phrases their plain, ordinary, natural or commonly accepted meaning.") (quotations omitted).

The relevant clause of the Financing Order repeatedly refers to administrative costs and
expenses "incurred since November 1, 2005" and prohibits any surcharge of Defendant's
collateral under § 506(c) for any services after that date.  Financing Order ¶ 10.  The clause also
expressly reserves "any rights the Debtor's professionals or the Committee's professionals may

have" under § 506(c) for costs and expenses incurred "prior to the appointment of the Chapter 11 Trustee." Id.  The Court entered the Financing Order on January 17, 2006, and the parties presumably were familiar with all the important events since the chapter 11 case began.  The Court appointed the Trustee of the Debtor on October 28, 2005.  See In re Felt Mfg., Doc. No. 177.  The Plaintiff's complaint seeks surcharge for costs and expenses rendered from the petition date, September 16, 2005, through the date the Trustee was appointed, October 28, 2005, a time frame Plaintiff calls the "surcharge period."  Complaint ¶ 1.   Accordingly, the Plaintiff seeks only what the Financing Order does not prohibit: costs and expenses before the Trustee was appointed.  The Court will not read beyond what the plain language of this paragraph allows. The Plaintiff may seek to recover administrative costs and expenses incurred before November 1, 2005, on behalf of the professionals.

The Defendant also argues the Trustee nevertheless waived his rights in the Financing Order.  The Court agrees that there was a wavier by the Trustee.  However, the terms of the waiver only applied to surcharges for services after November 1, 2005.  Any right to seek surcharges for costs incurred before that date were not waived and, therefore, preserved.  The Plaintiff only seeks what the Trustee did not waive, namely reimbursement for services of the professionals from the petition date through November 1, 2005.  One would expect that if the parties intended to completely foreclose the possibility of surcharge under § 506(c) for these costs and expenses, they would not have used a specific cut-off date that left an obvious gap of nearly six weeks under which the Trustee could seek a surcharge for the expenses incurred by

the Debtor's professionals and the Committee's professionals. The Financing Order allows a surcharge on Defendant's collateral before November 1, 2005.[5]

The Trustee did not waive his rights under the orders as explained above. It is undisputed that the Plaintiff succeeded to the Trustee's rights under the plan. Therefore, there is no administrative claimant standing issue here as in Hartford Underwriters.[6] The Plaintiff now stands in the Trustee's shoes under the terms of the Plan, and a trustee or a debtor-in-possession is the proper party to invoke § 506(c).[7] Hartford Underwriters, 530 U.S. at 6-7. The facts raised by the Defendant do not establish the standing and waiver defenses "with certitude." Nisselson, 469 F.3d at 150. The facts are quite the contrary. After reviewing the complaint, the Court finds the Plaintiff sufficiently plead the right to pursue surcharge by referring to the reservations and language in the Financing Order and Sale Order. See Complaint ¶¶ 6, 18-23. The Court will accordingly deny the Defendant's motion to dismiss on the standing and waiver defenses. But to

---

[5] The Plaintiff also refers to a surcharge reservation in the order approving the sale of the Debtor's assets to Foss Manufacturing Company, LLC. See In re Felt Mfg., Doc. No. 694 (the "Sale Order"). The Sale Order provided that the sale proceeds would pay off the Defendant's lien on the Debtor's assets but with the qualification that "CapitalSource's liability for 506(c) surcharge under the Financing Order is fully preserved." Sale Order, ¶3(a). The Court finds no ambiguity in the Sale Order either.

[6] The Supreme Court in Hartford Underwriters did not address whether a party other than a debtor or trustee could be granted standing under the terms of a financing order, so the issue was left unresolved. See 530 U.S. at 6 n.2. The Court does not see any reason why it would allow the Trustee or the debtor-in-possession to bring a § 506(c) claim but not the Plaintiff when the Plaintiff succeeded to nearly all the same rights and is effectively the same legal entity with a new name and a slightly different form.

[7] It makes no difference that the professionals are essentially the ones seeking to surcharge because the Plaintiff agreed to bring the complaint and the Plaintiff is the property party with standing.

resolve any ambiguity in the complaint and the Financing Order,[8] the Court will grant the

Defendant's motion in part to the extent the Plaintiff seeks to surcharge for services after

October 28, 2005.

### B.  The Superpriority Claim and the Ability to Surcharge

The Defendant next argues that the Financing Order gave it a superpriority administrative

expense claim under § 364(c) superior to all other administrative expense claims, including the

Plaintiff's claim under § 506(c).  The Defendant contends that another paragraph in the

Financing Order immunized the sale proceeds—used to pay off its lien on the Debtor's

assets—from any later potential surcharge under § 506(c).

Paragraph 9 of the Financing Order provides:

> **<u>Superpriority Claim</u>**.
> (a)     Upon entry of this Order, the [Defendant] shall be deemed to have an
>         allowed superpriority administration expense claim . . . pursuant to section
>         364(c)(1) of the Bankruptcy Code for all of the Post-Petition Debt, having
>         supreme priority over all other administrative expenses in the Chapter 11
>         Case, including those specified in or arising or ordered pursuant to
>         section[] . . . 506(c) . . . of the Bankruptcy Code, whether or not such
>         expenses or claims may become secured by a judgment lien or other non-
>         consensual lien, levy, attachment, or otherwise.

Financing Order ¶ 9(a).  Again, the Court will assess the Financing Order's provisions under

New Hampshire law.

As stated earlier, New Hampshire courts examine the clarity of a contract by evaluating it

as a whole, not by examining isolated words and phrases.  <u>Wright v. Loon Mountain Recreation</u>

---

[8]  There is some ambiguity between the cut-off dates used in the Financing Order.  One cut-off
date was November 1, 2005, and the other was the date "prior to the appointment of the [Trustee]," which
was October 28, 2005.  <u>See</u> Financing Order ¶ 10; <u>In re Felt Mfg.</u>, Doc. No. 177.  The Plaintiff's
complaint only seeks surcharge from the petition date through the earlier date of October 28, 2005.

Corp., 140 N.H. 166, 169-70 (1995). Normally, specific language is treated as a limitation on general language. Central Int'l Co. v. Kemper Nat'l Ins. Co., 202 F.3d 372, 374 (1st Cir. 2000) (citing Restatement (Second) Contracts § 203(c) (1979)). General language is therefore given effect, unless the specific language indicates a restriction on the general terms. Corwin v. Hood, 58 N.H. 401, 402 (1878).

Paragraph 9 of the Financing Order grants the Defendant a superpriority administrative expense claim for all of its post-petition credit given to the Debtor. The clause grants a claim with "supreme priority over all other administrative expenses," including those under "sections 105(a), 326, 327, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 of the Bankruptcy Code . . . ." Financing Order ¶ 9(a). Paragraph 9 lists all the administrative expense claims that could take priority over the Defendant's claim. But paragraph 9 cannot trump paragraph 10, which specifically discusses the potential surcharge of post-petition financing under § 506(c). Paragraph 10 explains exactly what can be surcharged and details the costs and administrative expenses in the chapter 11 case and their priority "with the Superpriority Claim of the [Defendant] for the Post-Petition Debt." Financing Order ¶ 10 (referring to paragraph 9).

The Defendant believes that paragraph 10 is a general reservation that should not be read to render the specific grant in paragraph 9 meaningless. The Defendant has it backwards. Paragraph 10 is the more specific provision and paragraph 9 is the more general. Paragraph 9 gives the Defendant a general superpriority claim. However, paragraph 10 is a specific carve-out of the § 506(c) rights, albeit limited in scope. The specific language used in paragraph 10 thus operates as a limitation on the general language used in paragraph 9. See Corwin, 58 N.H. at

402.  Reading both paragraphs together, the understanding was the Defendant would have a superpriority claim over all administrative costs and expenses, including § 506(c), but only over claims for costs and expenses incurred after November 1, 2005.  The Defendant's interpretation would render paragraph 10 meaningless.  If paragraph 9 gives the Defendant a superpriority claim over everything, including surcharges under § 506(c), what is the point of reserving a right to surcharge under defined circumstances in the very next clause?  See Puerto Rico Tel. Co. v. Advanced Cellular Sys., Inc. (In re Advanced Cellular Sys., Inc.), 483 F.3d 7, 12 (1st Cir. 2007) ("It is well-established that courts should avoid interpretations that render a provision of an agreement surplusage.").

The Financing Order follows the same structure as countless other orders and contracts, i.e., a more specific provision follows the more general provision.  A court does not violate contract interpretation principles simply because it finds a more detailed provision to control the outcome over a general provision that has panoptic applicability.  See New Seabury, 450 F.3d at 36 (interpreting a stipulation allowing a chapter 11 debtor to retain a portion of one of its businesses and finding the paragraph that generally characterized the business the debtor was to retain did not control because the paragraphs that followed more precisely explained what fit within the general rubric and specified the parties' rights).  In sum, the general reference to § 506(c) in paragraph 9 does not control the more specific description of the § 506(c) rights in paragraph 10.  See Parkhurst v. Gibson, 133 N.H. 57, 63 (1990) (noting the accepted interpretive rule that a general, preliminary clause does not take priority over specific provisions of a contract); 11 Richard A. Lord, Williston on Contracts § 32:10 (4th ed. 1999) ("Where general and specific clauses conflict, the specific clause governs the meaning of the contract."); see also

Lawson v. FDIC, 3 F.3d 11, 17 (1st Cir. 2003) (noting the rule of contract interpretation that the specific controls the general).

The Court need not go further.  Paragraph 9(a) of the Financing Order did not immunize the sale proceeds from surcharge by the Plaintiff because it only gave the Defendant a superpriority claim as a general matter and paragraph 10 controls the result in this proceeding. Consequently, the Court will deny the Motion based on the argument that paragraph 9(a) of the Financing Order immunizes the Defendant's superpriority claim from surcharge.

**C.  Res Judicata**

The Defendant next raises a res judicata defense and argues that the plan did not assign the right to bring a § 506(c) claim, so the Plaintiff is now barred from asserting a surcharge action in his complaint because the plan has binding preclusive effect.  Because the plan failed to mention § 506(c) claims specifically in its definition of "causes of action," the Defendant believes the Plaintiff cannot rely on the standard blanket reservation in that same definition.

Section VII.A of the plan in part provides:

> The Plan Administrator, on behalf of the Liquidation Trust, shall retain, and, . . . may exclusively enforce, any and all such claims, rights or Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, a bankruptcy court adversary proceeding filed in this Case.  The Plan Administrator, on behalf of the Liquidation Trust, shall have the exclusive right, authority, and discretion . . . to institute, prosecute, abandon, settle, or compromise any and all such claims, rights and Causes of Action, subject to the requirement of obtaining Oversight Committee approval before taking such action, but shall not be required to seek Bankruptcy Court approval.

Third Amended Plan of Liquidation, § VII.A, In re Felt Mfg., Doc. No. 1122 (the "Third Amended Plan").[9]  The term "Causes of Action" is defined as:

---

[9]  The second amended plan of liquidation ("Second Amended Plan") also contained a nearly identical paragraph except that the word "Liquidation Trust" in the Third Amended Plan replaced

> [A]ny and all claims, demands, rights, actions, causes of action and suits of the
> Debtor and the Estate, of any kind or character whatsoever, known or unknown,
> suspected or unsuspected, matured or unmatured, whether arising prior to, on or
> after the Petition Date, in contract or in tort, at law or in equity or under any other
> theory of law, of the Debtor or the Debtor's Estate, including but not limited to
> (1) rights of setoff, counterclaim or recoupment, and claims on contracts or for
> breaches of duties imposed by law; (2) the right to object to claims or interests;
> (3) claims pursuant to section 362 of the Bankruptcy Code; (4) such claims and
> defenses as fraud, negligence, breach of fiduciary duty, corporate waste, unlawful
> dividends, mistake, duress and usury; (5) all Avoidance Actions; (6) claims for
> tax refunds; (7) any other claims which may be asserted against third parties or
> Insiders.

Third Amended Plan, § I.  The Defendant points to these provisions and asserts that even if the

Plaintiff were assigned the right to bring "Causes of Action," that definition does not mention

§ 506(c) claims so they must have purposefully been excluded, or, alternatively, the Third

Amended Plan's use of a "broad and all-inclusive" definition fails to preserve the claims.

### 1.  Applicable Law

The parties chose New Hampshire law to govern their rights and obligations under the

Third Amended Plan and applicable case law requires that result anyway, so the Court does not

need to change its interpretive analysis.  See Third Amended Plan, § IX.O; Official Comm. of

Unsecured Creditors v. Dow Chem. Corp. (In re Dow Chem. Corp.), 456 F.3d 668, 676 (6th Cir.

2006) (noting that state law governs interpretations of a confirmed plan); Dolven v. Bartleson (In

re Bartleson), 253 B.R. 75, 84 (B.A.P. 9th Cir. 2000) ("The law of the state in which the plan

was confirmed governs its interpretation.").  The Defendant raises a preclusion defense,

however, and that involves an overlapping concern.  Because the judgment rendered by the

Court, i.e., the order confirming the Third Amended Plan, was rendered by a federal tribunal—a

_____

"Liquidating Debtor and the Estate" in the Second Amended Plan.

bankruptcy court—federal preclusion principles apply.  See 11 U.S.C. § 1141(a); Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 978 (1st Cir. 1995); see also Mourad v. Farrell (In re V & M Mgmt., Inc.), 321 F.3d 6, 8-9 (1st Cir. 2003) (noting parties who participate in bankruptcy proceedings are bound by confirmed reorganization plans under res judicata principles). Accordingly, the Court interprets the Third Amended Plan under state law and resolves any preclusion issue under federal law.  See Simonetti Dev., Ltd. v. Hillard Dev. Corp. (In re Hillard Dev. Corp.), 238 B.R. 857, 872 (Bankr. S.D. Fla. 1999).

The Bankruptcy Code allows a reorganized debtor to bring post-confirmation actions by preserving them in a plan.  Specifically, a plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate," or "the retention and enforcement" of a claim or interest by the debtor, trustee, or a representative of the estate.  11 U.S.C. § 1123(b)(3)(A) and (B).  The general rule is that §§ 1123 and 1141 operate on confirmed reorganization plans to bind all parties, and issues with the plan that could have been raised are thereafter barred by res judicata.  See, e.g., Harstad v. First Am. Bank, 39 F.3d 898, 902-03 (8th Cir. 1994).  After confirmation, the ability of the trustee, debtor, or estate representative to enforce a claim once held by the estate is limited to what the plan retains.  Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC), 540 F.3d 351, 355 (5th Cir. 2008); Paramount Plastics, Inc. v. Polymerland, Inc. (In re Paramount Plastics, Inc.), 172 B.R. 331, 333 (Bankr. W.D. Wash. 1994).  But there is an exception to res judicata under these circumstances: the claim will not be precluded if the plan reserves the right to bring those claims in a later action.  See Browning v. Levy, 283 F.3d 761, 774 (6th Cir. 2002).

Courts differ on how specific the reservation language in a plan must be to preserve the claim.  See Connolly v. City of Houston (In re Western Integrated Networks, LLC), 329 B.R. 334, 338 (Bankr. D. Colo. 2005) (describing two approaches to "rights reservations" in chapter 11 plans); 7 Lawrence P. King, Collier on Bankruptcy ¶ 1123.02[3][b], at 1123-23 (Alan N. Resnick & Henry J. Sommer eds., 15th rev. ed. 2008) (hereinafter Collier on Bankruptcy) (noting disagreement over the specificity required to preserve claims).  Some courts require plans to have specific reservations that identify the type of actions by Code section or that use clear, precise, or unequivocal language.  See e.g., United Operating, 540 F.3d at 355; Browning, 283 F.3d at 774-75; Harstad, 39 F.3d at 903; Retail Mktg. Co. v. King (In re Mako, Inc.), 985 F.2d 1052 (10th Cir. 1993); Kelley v. South Bay Bank (In re Kelley), 199 B.R. 698 (B.A.P. 9th Cir. 1996); Slone v. M2M Int'l, Inc. (In re G-P Plastics, Inc.), 320 B.R. 861 (E.D. Mich. 2005). Other courts find that categorical language may be sufficient.  See, e.g., In re Weidel, 208 B.R. 848, 853 (Bankr. M.D.N.C. 1997) (citing cases).  And there are, of course, various other middle-ground approaches based on nuances in the plan language or in the procedural history of the particular case.  Each case must therefore be evaluated on its own terms.  See Elk Horn Coal Co., LLC v. Conveyor Mfg. & Supply, Inc. (In re Pen Holdings, Inc.), 316 B.R. 495, 504 (Bankr. M.D. Tenn. 1994) (noting courts must measure the § 1123(b)(3) reservation language in a plan in the context of each case and the particular claims at issue).

The First Circuit has rejected an argument that a plan that did not precisely mention the exact claim failed to preserve a plan liquidating supervisor's right to bring an avoidance action. See Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.), 375 F.3d 51, 59 (1st Cir. 2004). The plan in Bankvest expressly provided that the liquidating supervisor had the right to litigate

16

any "cause of action," which was expressly defined in the plan to include avoidance actions that served as the basis for the suit.  Id. at 59.  The court rejected a rule that each individual claim must be listed specifically to preserve it.  See id. (quoting P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.), 140 F.3d 1111, 1117 (7th Cir. 1998)).  The court, however, cited with approval cases that indicate the plan should at least unequivocally reserve the right to pursue claims "of a given type" or indicate in a general reservation the "type or category of claims" with sufficient specificity at least to put creditors on notice that their claims could be challenged post-confirmation.  Bankvest, 375 F.3d at 59 (citing, inter alia, Cohen v. TIC Fin. Sys. (In re Ampace Corp.), 279 B.R. 145, 160 (Bankr. D. Del. 2002)); see also Guttman v. Martin (In re Railworks Corp.), 325 B.R. 709, 717 (Bankr. D. Md. 2005).  The court also distinguished the plan before it from "provisions of a far more general nature" that reserved "all causes of action existing in favor of the Debtor" and "any right of Debtors to recover assets pursuant to the provisions of the Bankruptcy Code."  Bankvest, 375 F.3d at 59-60 (quoting D&K Props. Crystal Lake v. Mut. Life Ins. Co. of N.Y., 112 F.3d 257, 259 (7th Cir. 1997) and Harstad, 39 F.3d at 902).  In the First Circuit, categorical reservations are sufficient, so long as the language used identifies the categories with enough detail to put creditors on notice.

    The First Circuit's approach is consistent with the underlying purposes behind reserving rights in a plan.  Although courts make much of the specificity required to reserve rights in a plan, the animating concern behind all these cases is notice because § 1123(b)(3) is "fundamentally a notice provision."  In re Bleu Room Experience, Inc., 304 B.R. 309, 314 (Bankr. E.D. Mich. 2004); see Harstad, 39 F.3d at 903 ("We view § 1123(b)(3) as, at least in part, a notice provision"); Pen Holdings, 316 B.R. at 500-01 (noting the purpose of § 1123(b)(3)

is generally to notify creditors of unliquidated assets that are preserved for later prosecution).[10]

"While few courts explicitly state lack of notice as the rationale for their decision, many courts invoke 11 U.S.C. § 1123(b)(3) when the facts suggest that the defendant in a post[-]confirmation cause of action has been 'blind sided' by the debtor's failure to be sufficiently specific in its reservation of rights clause." Bleu Room Experience, 304 B.R. at 314.  A plan that contains some description of the types of claims the debtor, trustee, or estate representative may later bring at least allows affected parties to weigh the risks and benefits beforehand.  Failure to adequately reserve a claim in a plan directly bears on the adequacy of notice and affects the operation of res judicata at confirmation.

> This is a logical consequence of the nature of a bankruptcy, which is designed primarily to secure prompt, effective administration and settlement of all [a] debtor's assets and liabilities within a limited time.  To facilitate this timely, comprehensive resolution of an estate, a debtor must put its creditors on notice of any claim it wishes to pursue after confirmation.  Proper notice allows creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it—absent specific and unequivocal retention language in the plan, creditors lack sufficient information regarding their benefits and potential liabilities to cast an intelligent vote.

---

[10]  See also NVF Co. v. New Castle County, 276 B.R. 340, 349 (D. Del. 2002) ("Section 1123(b)(3) has the effect of putting creditors of the estate on notice of the debtor's intent to pursue claims following the confirmation."); CLC Creditors' Grantor Trust v. Sonnenschein Nath & Rosenthal LLP (In re Commercial Loan Corp.), 363 B.R. 559, 570 (Bankr. N.D. Ill. 2007) (describing notice rationale under § 1123(b)(3)); Moecker v. Johnson (In re Transit Group, Inc.), 332 B.R. 45, 57-58 (Bankr. M.D. Fla. 2005) (describing notice under § 1123(b)(3)); Kaye v. A.R.E. Distrib. & Alpine Records, LLC (In re Value Music Concepts, Inc.), 329 B.R. 111, 120 (Bankr. N.D. Ga. 2005) (examining plan provisions to determine if they sufficiently identified the causes of action and gave adequate notice of the reservation to creditors); Ice Cream Liquidation, Inc. v. Calip Dairies (In re Ice Cream Liquidation, Inc.), 319 B.R. 324, 337-38 (Bankr. D. Conn. 2005) (examining plan reservation to determine whether it gave notice of debtor's intention to pursue post-confirmation actions).

United Operating, 540 F.3d at 355 (quotations and citations omitted).  Proper notice also assures that creditors will not be duped into voting for a plan only later to find out that they might be sued post-confirmation on a claim that was reserved in the same plan.

### 2.  The Debtor's Plan and Res Judicata

With these principles in mind, the Court turns to the provisions here.  The Third Amended Plan gave the Plaintiff the exclusive right to enforce causes of action, which included seven categories of claims.  None of the first six categories listed mentioned § 506(c) claims or anything like "surcharge actions."  So at least measured against the standard in the First Circuit, the language in those first six categories fails to preserve the § 506(c) claim.  The seventh category is a catch-all provision: "any other claims which may be asserted against third parties or Insiders."  That provision appears to be the type of general reservation that courts usually find unsatisfactory to preserve claims and the type the First Circuit proposed as "far more general" in nature (and insufficient) in Bankvest.  But the Court is not limited to the language in the plan; it may also rely on the disclosure statement.  See Kelley, 199 B.R. at 704 (debtor must reserve claim in either schedules, disclosure statement, or plan); IBM Southeast Employees Fed. Credit Union v. Collins, 2008 WL 4279554, at *10 (M.D. Tenn. Sept. 17, 2008) (considering plan, disclosure statement, and order collectively); In re SmarTalk Teleservices, Inc. Sec. Litig., 487 F. Supp. 2d 914, 928 (S.D. Ohio 2007) (supplementing plan with disclosure statement); Morris v. Zelch (In re Regional Diagnostics, LLC), 372 B.R. 3, 12 (Bankr. N.D. Ohio 2007) (same).

The second amended disclosure statement (included with the Second Amended Plan filed in the Debtor's bankruptcy case on October 18, 2006), contained the following statement concerning the allowance and treatment of administrative expense claims:

Moreover, the Committee anticipates that the Chapter 11 Trustee intends to file an application to surcharge CapSource's collateral pursuant to section 506(c) of the Bankruptcy Code for certain of the fees and expenses that were incurred during the period from the Petition Date through the end of October 2005, during which time there was no carve-out in the cash collateral stipulations and orders, nor was there a section 506(c) surcharge waiver in favor of CapSource. Any recoveries in respect of such surcharge applications would be used to satisfy the relevant administrative claims and thus would reduce the overall amount of Administrative Expense Claims accordingly.

Second Amended Disclosure Statement, § VI.A.1, In re Felt Mfg., Doc. No. 939 (the "Disclosure Statement").[11]  The Disclosure Statement was approved by the Court without objection from the Defendant.  See In re Felt Mfg., Doc. No. 957.  The Court finds that this provision in the Disclosure Statement gave all the notice the Defendant was entitled to and adequately preserved the cause of action under § 506(c).  As a general rule (and as recognized by the First Circuit in Bankvest), there is no requirement that the exact cause of action must be listed; in this case, the § 506(c) cause of action was detailed in the Disclosure Statement, and the Defendant and any other creditors are presumed to know about it.[12]

Moreover, the Court is not going to ignore the Defendant's active participation on the surcharge issue and its knowledge of a potential surcharge action well before this adversary proceeding started.  The Defendant here had plenty of notice, even assuming the Disclosure Statement failed to give the notice required under § 1123(b)(3) (which it did not).  After disclosing the possibility of an application to surcharge the Defendant's collateral in the Disclosure Statement, the Trustee later filed an application on December 18, 2006.  See In re

---

[11]  The first amended disclosure statement filed on October 9, 2006, also contained this exact same paragraph under the same section heading.

[12]  It makes little difference that the surcharge action's actual form was an adversary proceeding and not an "application" because the § 506(c) claim was disclosed clearly and openly.

Felt Mfg., Doc. No. 1063.  The Defendant filed an objection to the surcharge application on

procedural grounds and argued the application should have been filed as an adversary

proceeding (it also reserved its rights to object on substantive grounds).  See In re Felt Mfg.,

Doc. No. 1093.  The Court later confirmed the Second Amended Plan but excluded from the

confirmation order proposed language that would have made it explicit that the Plaintiff

succeeded to the § 506(c) claims.  The Court entered an order the same day denying as moot the

Defendant's objection to the surcharge application.  Before the Second Amended Plan ever went

into effect, however, the Committee moved to amend the plan again and filed the Third

Amended Plan on April 11, 2007.  The Third Amended Plan contained several new provisions

dealing with § 506(c).  The definitions section in the Third Amended Plan included the following

definition for "Section 506(c) Claim":

> the claim of the Estate to surcharge the collateral of CapSource pursuant to
> Section 506(c) of the Bankruptcy Code, as asserted in the motion to surcharge
> filed on December 18, 2006 by the Chapter 11 Trustee prior to the Effective Date
> (the "Surcharge Motion"), and any other surcharge claim asserted by the Plan
> Administrator as successor to the Chapter 11 Trustee after the Effective Date.

Third Amended Plan, § I.  In a later provision titled "Plan Objectives," the Third Amended Plan

also provided that "[o]n the Effective Date, all of the Estate's remaining assets, which are

principally the Causes of Action, certain directors' and officers' liability insurance policies . . .

and the Section 506(c) Claim, shall vest in the Liquidation Trust."  Third Amended Plan, § III

(emphasis added).  Still later, in the "Plan Implementation" section, the Third Amended Plan

provides a subsection for the rights and powers of the Liquidation Trust and states:

> The Liquidation Trust, acting through the Plan Administrator . . . , shall be
> authorized to exercise and perform the rights, powers and duties held by the
> Estate, including without limitation the authority under section 1123(b)(3) of the
> Bankruptcy Code, to provide for the prosecution, settlement, adjustment,

> retention and enforcement of claims and interests of the Estate, including but not limited to the Causes of Action, and the authority to exercise all rights and powers under <u>section[] 506(c)</u> . . . of the Bankruptcy Code.

Third Amended Plan, § VI.A.3 (emphasis added). The Defendant objected to the motion to amend the plan and argued the Bankruptcy Code prohibits the Plaintiff from pursuing a § 506(c) claim. The Court granted the motion to amend and confirmed the Third Amended Plan over the Defendant's objection.[13]

The provisions in the confirmed Third Amended Plan and those in the earlier Disclosure Statement adequately reserved the Plaintiff's rights and provided sufficient notice that § 506(c) claims survived the confirmation order. The language used was better than categorical; it was detailed and specific. If the purpose behind § 1123(b)(3) is notice, it would be difficult to find that the Defendant was not on notice that a surcharge action under § 506(c) was likely, considering its full and active participation in the surcharge dispute after that information was already included in the Disclosure Statement and was later added in the confirmed Third Amended Plan. In sum, the Plaintiff's § 506(c) claim is not barred by res judicata because the Disclosure Statement and Third Amended Plan gave the Defendant full and adequate notice. Accordingly, the Court will deny the Defendant's res judicata defense.

### D. Failure to Allege Sufficient Facts to Establish § 506(c) Elements

Lastly, the Defendant makes a traditional "failure to state a claim" argument that a complaint under § 506(c) must allege sufficient facts to demonstrate (1) actual expenditures, (2) that were necessary and reasonable, and (3) that directly and intentionally benefited the secured

---

[13] The surcharge application was still pending at this point and the Court issued a scheduling order to brief whether the surcharge claim should pursued by an adversary proceeding or by motion. But the Plaintiff filed his complaint to start this adversary in the meantime and the issue became moot.

party, not the debtor.  The Defendant argues the complaint failed to allege sufficient facts under

all of these elements.  The Court will review the complaint under each element in turn.

### 1.  Actual Expenditures

The Defendant argues the first element requires a prima facie showing that the estate

actually expended money in connection with the services for which reimbursement is sought and

since the professionals here apparently worked on credit, the Plaintiff's claim fails because the

Debtor did not "expend money."  The Defendant cites Loudoun Leasing Dev. Co. v. Ford Motor

Credit Co. (In re K & L Lakeland, Inc.), 128 F.3d 203 (4th Cir. 1997) and the relevant legislative

history of § 506(c) in support of this position.[14]  The legislative history behind § 506(c) provides:

> Any time the trustee or debtor in possession expends money to provide for the
> reasonable and necessary cost and expenses of preserving or disposing of a
> secured creditor's collateral, the trustee or debtor in possession is entitled to
> recover such expenses from the secured party or from the property securing an
> allowed secured claim held by such party.

124 Cong. Rec. H11089 (Sept. 28, 1978) (statement of Rep. Edwards), reprinted in 1978

U.S.C.C.A.N. 5787, 6451.  In K & L Lakeland, the secured creditor argued that reimbursement

may only be sought for actual expenditures of money to cover the costs of preserving or

disposing of a secured party's collateral and any liabilities incurred on credit cannot form the

basis for a surcharge.  128 F.3d at 208.  The Fourth Circuit agreed with this argument, citing

several cases that stated the claimant must show funds were expended.  Id.  The court itself

recognized though that "it is true that these cases use these terms in the context of setting forth

the requisite elements of a claim under § 506(c), and not, as I do, to establish the [prerequisite]

---

[14]    The Supreme Court in Hartford Underwriters never addressed whether a trustee may use §
506(c) to seek reimbursement prior to making actual expenditures, i.e., working on credit instead.  See
530 U.S. at 11 n.4 (citing In re K & L Lakeland).

of actual expenditure . . . ."  <u>Id.</u>  But the court thought that it strained belief that so many courts would use the words so carelessly without awareness of the common meaning of "expend," especially since most of the courts cite the relevant passage of the legislative history.  <u>Id.</u>  The court also noted that one particular bankruptcy court, which has repeatedly confronted the issue, requires an "actual expenditure of money" under § 506(c).  <u>Id.</u> at 208-209.

The actual expenditure holding in <u>K & L Lakeland</u> has little precedential value, however, because Judge Ervin, writing for the majority on the judgment, was the only judge on the panel to hold that an actual expenditure is required.  Two other judges on the panel wrote separate opinions.  <u>Id.</u> at 211.  Judge Phillips concurred in part and concurred in the judgment but would not have decided the issue of actual expenditures versus credit under § 506(c).  <u>Id.</u>  The other panel member, Judge Hamilton, dissented on the actual expenditure point.  Thus, the decision's precedential value on the actual expenditure issue is problematic.  Judge Hamilton, in dissent, noted what he thought were several flaws in Judge Ervin's actual expenditure discussion, and his comments are worthy of repeating in full:

> First, in concluding that § 506(c) requires an actual expenditure, Judge Ervin relies primarily on the "expense" or "expenditure" language contained in § 506(c) and numerous decisions interpreting § 506(c).  Judge Ervin's sole focus on the word "expense," however, ignores the fact that § 506(c) also permits the recovery of "reasonable, necessary costs."  <u>See</u> 11 U.S.C. § 506(c) ("The trustee may recover from property securing an allowed secured claim the reasonable, necessary <u>costs and expenses</u> . . . .") (emphasis added).  A "cost" is defined as "the amount or equivalent paid or given <u>or charged</u> or engaged to be paid or given for anything bought or taken in barter or for service rendered" and as "an item of outlay <u>incurred</u> in the operation of a business enterprise."  <u>Webster's Third New International Dictionary</u> 515 (1981) (emphasis added).  Thus, by its plain language, § 506(c) permits the bankruptcy trustee to recover costs that have not actually been paid, but rather have accrued in order to preserve or dispose of secured assets.

Second, Judge Ervin's reliance on the "expenditure" or "expense" language used by courts in various decisions is misplaced in light of the fact almost none of these courts actually addressed whether § 506(c) requires an actual expenditure or, alternatively, whether the incurrence of a cost or the extension of credit suffices for recovery under § 506(c). <u>See, e.g.</u>, <u>In re Visual Indus., Inc.</u>, 57 F.3d 321, 324-26 (3d Cir. 1995); <u>In re Senior-G & A Operating Co., Inc.</u>, 957 F.2d 1290, 1298-1300 (5th Cir. 1992). Instead, these courts merely refer to an "expense" or "expenditure" in the context of a general discussion about the requirements of § 506(c). In addition, . . . the Eighth Circuit[] has rejected the argument that because a debt was merely incurred, rather than an expenditure paid, § 506(c) does not permit the secured creditor to be surcharged. <u>See</u> <u>IRS v. Boatmen's First Nat'l Bank</u>, 5 F.3d 1157, 1160 (8th Cir. 1993) (holding that unpaid payroll taxes could be surcharged to secured creditor even though no funds were advanced to the debtor-in-possession or to the bankruptcy trustee).

Finally, the most significant problem with Judge Ervin's conclusion . . . is that his analysis and resulting conclusion undermine the central purpose of § 506(c), which is to prevent a secured creditor from gaining a windfall at the expense of the estate. Under Judge Ervin's reasoning, even where a secured creditor implicitly consents to the continued operation of a business by entering into post-petition cash collateral agreements, as long as no cash changes hands, the cost incurred cannot be surcharged to the secured creditor, regardless of the extent of the benefit to the secured creditor. Such a conclusion not only is based on an artificial distinction between an expenditure that has actually been paid and a debt that has been merely incurred, but also permits the very windfall § 506(c) was designed to prevent.

For these reasons, I would hold that § 506(c) does not require an actual cash expenditure, but rather permits the bankrupt estate to recover administrative expenses where a debt merely has been incurred, as long as the other requirements of § 506(c) are satisfied. A contrary interpretation is not supported by either the text of § 506(c) or the case law interpreting that text and would defeat the purpose of § 506(c) by permitting a secured creditor to reap a direct benefit without reimbursing the bankrupt estate.

<u>K & L Lakeland</u>, 128 F.3d at 212 (some citations omitted).

Judge Ervin, in holding that an actual expenditure is required, was also particularly troubled by the facts before him and that might account for his analysis. The administrative claimants were the debtor's landlords and both were essentially controlled by the same two persons. <u>Id.</u> at 210. They sought to surcharge the secured creditor's collateral for unpaid post-

25

petition rent when they had defaulted on their rent obligations.  Id.  Judge Ervin was troubled by

the apparent self-dealing between the debtor and its landlord and believed the Bankruptcy Code

did not intend a secured creditor to have to pay the very people who defaulted on their

obligations.  Id.  The Court here deals with different facts.  Assuming the complaint's truth, as

the Court must at this stage, the professionals in this case worked on credit based on an

understanding that they would be paid later.  The complaint alleges that they preserved and

enhanced the collateral's value so that the secured creditor obtained full satisfaction of its pre-

petition credit facility when the Debtor's assets were sold.  See Complaint, ¶¶1-6.  The concerns

identified by Judge Ervin in K & L Lakeland are not particularly relevant in these

circumstances.[15]

    Moreover, since K & L Lakeland, the Ninth Circuit has also weighed in on this issue and

it held that "the right to the proceeds of the surcharge should not depend on a formalistic

distinction between whether the debtor expended money or simply incurred debt prior to seeking

the surcharge."  Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds

Hotel & Casino, Inc.), 255 F.3d 1061, 1067-68 (9th Cir. 2001).

    This Court agrees that a § 506(c) claim should not depend on formalistic distinctions

between an actual cash expenditure and credit for many of the reasons identified by Judge

Hamilton in dissent in K & L Lakeland.  The other § 506(c) elements will also certainly guard

against abuse by administrative claimants.  As the Ninth Circuit pointed out,

---

[15]  The procedural posture of K & L Lakeland was also very different.  This case is only at the
motion to dismiss stage—as early as it gets—and without any evidence presented.  But the bankruptcy
court decision that was appealed in K & L Lakeland came only after a two-day trial on the § 506(c)
motions.  128 F.3d at 205.

the party seeking the surcharge must [also] prove that its expenses were reasonable, necessary and provided a quantifiable benefit to the secured creditor. This is not an easy standard to meet.  It is the party seeking the surcharge that has the burden of showing a "concrete" and "quantifiable" benefit.  The § 506 recovery is limited to the amount of the benefit actually proven.  Because a party seeking a surcharge faces an onerous burden of proof, it is unlikely that creditors will use this provision when any other provision of the Code is available.  Furthermore, because the amount of a surcharge is limited to the amount of the benefit and must be proven with specificity, the deserving party is easily ascertainable.

Debbie Reynolds, 255 F.3d at 1068 (citations omitted).  For these reasons, the Court disagrees with the Defendant that the Plaintiff needs to allege actual expenditures, as opposed to credit, to proceed under § 506(c).

### 2.  Necessary and Reasonable

Second, the Defendant argues the Plaintiff fails to allege facts showing that the professionals' services were necessary and reasonable and fails to state why it was necessary and reasonable to have the professionals essentially performing duplicative services.  The Defendant argues the Plaintiff did not explain why the Debtor needed two "turnaround management" firms, two law firms serving as outside counsel, and two law firms serving as local counsel.

As stated above, the second element of a § 506(c) claim requires showing the costs and expenses are both necessary and reasonable.  To recover a "necessary" expense, each item must (1) have been incurred to preserve or dispose of the secured creditor's collateral and (2) must have been necessary under the circumstances.  4 Collier on Bankruptcy ¶ 506.05[3], at 506-127.  "An expense is not 'necessary' if it bears no relation to the collateral or was not essential to preserve or increase the value of the collateral."  Id.  Additionally, the costs and expenses must be reasonable.  Generally, reasonableness under § 506(c) is measured against a benchmark of the amount of costs and expenses that the secured creditor would have incurred by foreclosing on

27

the property on its own behalf.  Id. ¶ 506.05[4], at 506-128.  The reasonableness of attorneys'

fees and costs are considered in relation to federal standards under the lodestar method.  See

Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd., 282 F.3d 23, 34 (1st Cir. 2002).

Both of these prongs are fact-dependent.  At this stage, though, the Court only examines

the complaint to see whether it sets forth factual allegations regarding each element of § 506(c)

to raise a plausible expectation that discovery will support relief.  See Twombly, 127 S. Ct. at

1965; Gagliardi, 513 F.3d at 305.  Additionally, the complaint need not recite any "magic

words" to get past a motion to dismiss, it only has to put a defendant on fair notice of the claim.[16]

### a.  The Debtor's Professionals

The complaint groups the firms involved as either the Debtor's professionals or the

Committee's professionals.  The Court will examine the allegations in the complaint for each

group in turn.

### i.  CMAG

First, the Debtor's board of directors hired a turnaround management firm, Carl Marks

Advisory Group, LLC, and one of its principals, P. Woolard Harris (collectively "CMAG").

Complaint ¶ 3.  CMAG was hired "to stabilize and maintain the Debtor's business" and its

efforts included running the Debtor's business day-to-day, managing its finances, meeting with

trade vendors to ensure a supply of materials, meeting with key customers and employees,

developing budgets, and providing financial reports to the Committee and the Defendant.  Id.

---

[16]   See Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (no "magic words" are
required in complaint alleging unlawful discrimination); PSC Info Group v. Lason, Inc., 2008 WL
4660943, at *4 (E.D. Pa. Oct. 21, 2008) (discounting importance of presence or absence of "magic
words" in a complaint); Quantum Color Graphics, LLC v. Fan Assoc. Event Photo GmbH, 185 F. Supp.
2d 897, 904 (N.D. Ill. 2002) ("The question is not the magic words or language of the complaint, but the
substance of the allegations").

¶ 29.  CMAG was initially hired because the Debtor "was in crisis stemming from [the CEO's] resignation following the [Debtor's] acknowledgment of financial misreporting."  Id. ¶ 26.  The complaint states the services provided "were material in preserving the assets of the estate" and crucial to stabilizing the business because otherwise "there likely would not have been a viable [c]ompany for the Chapter 11 Trustee to step into and run, and no operating business to be sold for [the Defendant's] benefit."  Id. ¶ 35.

The Court finds these allegations show the expense of hiring CMAG was necessary because the services were incurred to preserve the going concern value of the business and its assets, on which the Defendant had its entire lien.  The time records attached as an exhibit to the complaint also provide more detailed support for the allegations.[17]  The complaint plausibly states a necessity for services rendered by CMAG under the circumstances of the business crisis when the Debtor hired CMAG.  The reasonableness of CMAG's services depends on further facts but, on the face of the complaint, the expenses do not appear outside the normal range.  The complaint states a plausible entitlement to a surcharge for the fees and expenses of CMAG.

### ii.  Foley Hoag

The Debtor retained the law firm of Foley Hoag LLP ("Foley Hoag") as its lead bankruptcy counsel after the Debtor's CEO resigned.  Complaint ¶ 36.  Foley Hoag's services included substantial work at the outset.  It prepared and filed several "first day" motions, including motions to use cash collateral, to prevent utilities from stopping service, to pay pre-petition employee wages, to permit the Debtor to use existing bank accounts, and a motion to

---

[17]  The Court may rely on exhibits attached to the complaint.  Bankruptcy Rule 7010 incorporates Rule 10 in adversary proceedings.  Rule 10 states: "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  Fed. R. Civ. P. 10(c); see Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998).

extend the time to file the Debtor's schedules.  Id. ¶ 37.  Foley Hoag negotiated the terms of cash

collateral motions with the Defendant.  Id. ¶ 38-40.  The firm also assisted in preparing "a

comprehensive communication strategy to help ensure that the Debtor's business operations

would continue in the ordinary course," which included drafting a press release, a script for calls

to key customers and vendors, and a communication with the Debtor's employees.  Id. ¶ 42.

Foley Hoag further participated in meetings with key managers and employees during the first

week of the bankruptcy case to answer questions, prepare senior management for the meetings,

and assist with calls to key customers.  Id. ¶ 42.

     Foley Hoag also helped to keep the Debtor operating by discussing contracts and leases

with various parties, responding to threats from utilities to stop services, helping to maintain

business insurance coverage, and assisting with responding to employee concerns.  Id. ¶ 44-45.

Lastly, the firm "worked to formulate a sale process" by fielding calls from interested buyers,

preparing a confidentiality agreement for potential acquirers, and communicating with the

Defendant and the Committee about the selection of an investment banker to help with the sale.

Id. ¶ 47-49.

     The Court finds this part of the complaint also adequately shows that hiring Foley Hoag

was necessary to preserve the going concern value of the Debtor's business and assets.  The

complaint states the "first day" motions were "particularly important to the Debtor's continued

operation as a going concern and survival in chapter 11.  Receivables collected from business

operations were the Debtor's primary source of operating cash without which the Debtor could

not pay vendors, employees and other expenses."  Id. ¶ 38.  The complaint also alleges these

services were necessary and were effective because "all of the Debtor's senior management

remained with the Debtor, there was minimal loss of other employees, the Debtor lost only one of its major customers and many of its key vendors continued to supply the Debtor with raw materials on terms no worse than existed prior to the Petition Date."  Id. ¶ 43.  Foley Hoag also submitted detailed time records as an exhibit to the complaint which provide more detail. Again, the services of the firm detailed in the complaint appear plausibly necessary under the circumstances precipitating and shortly after the Debtor's bankruptcy filing.  The reasonableness of the fees and expenses based on the Court's review of the time records do not appear outside the normal range and support the firm's request in the complaint.  The complaint states a plausible entitlement to a surcharge for the fees and expenses of Foley Hoag.

### iii.  Bernstein Shur

The law firm of Bernstein, Shur, Sawyer & Nelson, P.A. ("Bernstein Shur") was retained as the Debtor's local counsel.  Bernstein Shur's services "related to motions filed by the Debtor during the Surcharge Period to ensure the continued operation of the Debtor as a going concern, including motions relating to insurance financing, use of cash collateral to fund ongoing business operations, the payment of employee's pre-petition wages, and certain equipment lease matters." Complaint ¶ 61.  The complaint alleges the services provided by Bernstein Shur "conferred a benefit on CapSource and its collateral" and "were necessary to preserve the Debtor's ongoing operations and [to] permit the Debtor's ultimate sale as a going concern."  Id. ¶ 59, 61.

Although the Court is troubled by this generalized narrative, when supplemented with Bernstein Shur's time records as exhibits, it survives a motion to dismiss.  The services of local counsel were plausibly necessary under the circumstances because the Debtor filed in New Hampshire and hired outside counsel with offices in Massachusetts.  The time records appear to

detail coordination with outside counsel on many motions and issues, and reviews of local rules and procedures.  Again, the hours and rates do not appear to be outside the range of reasonableness and suffice for purposes of pleading a surcharge claim.  The complaint states a plausible entitlement to a surcharge for the fees and expenses of Bernstein Shur.

### b. The Committee's Professionals

The Plaintiff makes an argument in its complaint that the Defendant consented to the payment of fees and expenses for the Committee's professionals during the surcharge period by initially offering to provide payment for those professionals in a proposed post-petition financing budget.[18]  Complaint ¶ 62-67.  According to the complaint, "[d]uring the course of the negotiations between CapSource, the Chapter 11 Trustee and the Committee concerning the terms of post-petition financing, CapSource offered to provide for payment of 100% of the fees and disbursements of the Committee's [p]rofessionals since the formation of the Committee in early October."  Id. ¶ 62.  And, "[a]t CapSource's suggestion and request, the Committee's [p]rofessionals submitted to CapSource an itemization of the total amount of their fees and expenses incurred during the Surcharge Period."  Id. ¶ 63.  But when the Trustee sought approval of the post-petition financing loan (or "TIP" loan as the parties call it), the Debtor's professionals objected to the catch-up payment provision for the Committee's professionals because the Debtor's professionals were excluded from similar payments.  Id. ¶ 66.  Had the Debtor's professionals not objected, the Defendant "would have been prepared to fund all of the Committee's [p]rofessionals' fees and expenses incurred during the Surcharge Period."  Id. ¶ 67.

---

[18]  The Committee's professionals included Aurora Management Partners ("Aurora"), a turnaround management and financial advisory firm, Pachulski Stang Ziehl Young Jones LLP ("Pachulski Stang"), lead counsel to the Committee, and McLane Graf Raulerson & Middleton, P.A. ("McLane Graf"), local counsel to the Committee.

The Court's must accept these allegations as true for purposes of a motion to dismiss. One of the ways recovery under § 506(c) is available is if "the holder of the secured claim caused or consented to the expense."  In re Swann, 149 B.R. 137, 143 (Bankr. D.S.D. 1993); In re Trim-X, Inc., 695 F.2d 296, 301 (7th Cir. 1982) ("Although the emphasis under [§ 506] is on [the] 'benefit' to the secured creditor, considerations of 'consent' and 'causation' are still relevant.").  A court may treat a creditor's consent as "advance acknowledgment that certain of the costs and expenses incurred would benefit" the creditor.  Swann, 149 B.R. at 143 (quoting Collier on Bankruptcy).  But such consent is not lightly inferred.  In re S & S Indus., Inc., 30 B.R. 395, 398 (Bankr. E.D. Mich. 1983).  Consent is not implied merely from a creditor's acquiescence or cooperation, but courts do allow greater latitude for costs and expenses under § 506(c) when consent has been given.  Peninsula Fed. Sav. & Loan Ass'n v. Moore (In re Roggio), 49 B.R. 450, 453 (Bankr. D. Conn. 1985); Swann, 149 B.R. at 144; S & S Indus., 30 B.R. at 398.    Actual or express consent requires some clear and unambiguous affirmative expression.  See Black's Law Dictionary 323 (8th ed. 2004) (defining "express consent" as "[c]onsent that is clearly and unmistakably stated").  A secured creditor's actual or express consent to the payment of designated expenses limited in amount is not a blanket consent to other, additional administrative expense charges not included within the consent agreement. Gen. Elec. Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.), 762 F.2d 10, 12 (2d Cir. 1985) ("Flagstaff II").  By contrast, implied consent is "[c]onsent inferred from one's conduct rather than from one's direct expression."  Black's Law Dictionary 323.  Implied consent in these circumstances is generally limited to when the secured creditor caused the expense. Flagstaff II, 762 F.2d at 12; In re Roberts, 249 B.R. 152, 158 (Bankr. W.D. Mich. 2000).

The Court does not believe implied consent is necessarily the right term for the Defendant's offer to pay under these circumstances because the Defendant did not actually <u>cause</u> the expenses here.  The Court nonetheless finds express consent based on the allegations in the complaint.  Assuming their truth, the allegations are sufficient to show an express indication that the fees and expenses of the Committee's professionals were both necessary and reasonable for purposes of § 506(c).  If the Defendant offered to pay the full amount of the fees and expenses during the relevant surcharge period, this indicates a clear and unambiguous expression of consent to the necessity and reasonableness of the costs.  <u>See</u> 4 <u>Collier on Bankruptcy</u> ¶ 506.05[6], at 506-136 (noting that if the secured creditor expressly consents to payment of a specific administrative claim from its collateral, the consent may ensure payment of an administrative expense claim from the collateral).  The allegations, if true, show consent and go beyond mere cooperation or acquiescence by the Defendant.  <u>Cf.</u> <u>PSI, Inc. v. Aguillard (In re Senior-G & A Operating Co., Inc.)</u>, 957 F.2d 1290, 1300 (5th Cir. 1992) (finding consent to surcharge a portion of the cost of reworking an oil well where secured creditor agreed in advance to lend $250,000 to cover workover costs).  Accordingly, the Court finds the complaint adequately pleaded the Defendant's express consent to pay the Committee's professionals for fees and expenses during the surcharge period, and the Court has no need to review the sufficiency of the factual allegations for each of the Committee's professionals.

Moreover, the Court finds the complaint adequately pleaded the Defendant's consent for the direct benefit requirement of § 506(c) for the same reasons.  A secured party may be liable for administrative expenses even in the absence of a conferred benefit if the secured party consents and the consent is clear.  <u>See</u> <u>Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage</u>

Corp. (In re Blackwood Assoc., L.P.), 153 F.3d 61, 68 (2d Cir. 1998). Thus, the Court denies the Defendant's motion to dismiss entirely as it relates to the fees and expenses sought for the Committee's professionals. Although the Plaintiff adequately pleaded the Defendant's consent in the complaint, he nevertheless will be put to his burden of proof to show consent because the Court is only assuming the truth of the allegations at this stage. The complaint states a plausible entitlement to a surcharge for the fees and expenses of the Committee's professionals.

### 3. Direct Benefit

The Plaintiff's complaint must also satisfy the third element of a § 506(c) surcharge action: proving a direct benefit to the secured creditor. To establish this third element, a party must show that it "expended the funds primarily to benefit the secured creditor, who . . . in fact directly benefitted from the expenditure." In re Parque Forestal, Inc., 949 F.2d 504, 512 (1st Cir. 1991) (quoting Brookfield Prod. Credit Ass'n. v. Borron, 738 F.2d 951, 952 (8th Cir. 1984)). Expenses undertaken to improve the position of the debtor-in-possession, although indirectly benefiting the creditor, are not recoverable. Brookfield Prod., 738 F.3d at 952; Treasurer of Snohomish County v. Seattle-First Nat'l Bank (In re Glasply Marine Indus., Inc.), 971 F.2d. 391, 394 (9th Cir. 1992) (incidental benefits do not trigger § 506(c)). The benefit to the secured creditor must be something other than the generalized benefits of a chapter 11. In re RLA of Madison, Inc., 177 B.R. 78, 81 (Bankr. M.D. Tenn. 1994). Therefore, "[c]ourts have narrowly construed § 506 to encompass only those expenses that are specifically incurred for the express purpose of ensuring that the property is preserved and disposed of in a manner that provides the secured creditor with a maximum return on the debt and also apportions those costs to the secured creditor who, realistically, is assuming the asset." United Jersey Bank v. Miller (In re

35

C.S. Assoc.), 29 F.3d 903, 907 (3d Cir. 1994) (quoting In re Parr Meadows Racing Ass'n, 92

B.R. 30, 35-36 (E.D.N.Y. 1988), aff'd in part, rev'd in part on other grounds, 880 F.2d 1540 (2d

Cir. 1989)).   Section 506(c) "was designed to extract from a particular asset the cost of

preserving or disposing of that asset."  Id.  The party asserting a surcharge bears the burden of

establishing in quantifiable terms that it expended the funds directly to preserve the collateral.

Glasply Marine, 971 F.2d at 394.  Thus "[i]f the secured creditor derived no benefit from the

expense, or the expense was unnecessary, or if the benefit was too indefinite or remote, recovery

may be denied under § 506(c)."  4 Collier on Bankruptcy ¶ 506.05[5][c], at 506-135 (citing

cases) (footnotes omitted).  But this does not mean that § 506 is unavailable if parties other than

the secured creditor also received a benefit because of the expense.  See Senior-G & A

Operating, 957 F.2d at 1300 (rejecting this argument because the test for surchargeability under

§ 506 is that the expense must be "primarily" for the creditor's benefit).

        Whether expenses meet the requirements of § 506(c) depends on the facts of the

particular case and this is particularly true on the "direct benefit" element because the cases on

that element draw a wide array of distinctions.  See, e.g., Precision Steel Shearing Inc. v.

Fremont Fin. Corp. (In re Visual Indus., Inc.), 57 F.3d 321, 326-28 (3d Cir. 1995) (finding no

direct benefit to secured creditor where trade creditor provided steel to the debtor, an office

furniture manufacturer, because the raw materials that helped debtor to continue operating and

reduce its debt to its secured creditor only provided an incidental benefit); Parque Forestal, 949

F.2d at 512 (finding direct benefit to holder of a security interest in unsold property in a housing

development for security services provided to prevent vandalism of homes because the homes

might deteriorate in value); New Orleans Pub. Serv., Inc. v. First Fed. Sav. & Loan Ass'n (In re

Delta Towers, Ltd.), 924 F.2d 74, 78 (5th Cir. 1991) (finding no direct benefit to holder of security interest in a building and movables for utility services provided to operate a hotel because there was no separate preservation of the building or movables, any benefit was incidental, and the hotel had no going concern value).

### a.  The Debtor's Professionals

It bears repeating that the Court's job at this stage is not to make a merits determination on whether surcharge under § 506(c) will be established for the services provided.  The only task before the Court is to assess the adequacy of the factual allegations in the complaint and see if they raise a reasonable expectation that discovery will support a plausible claim for relief.  See Twombly, 127 S. Ct. at 1965.

### i.  CMAG

As stated above in section III.D.2.a.i, the complaint detailed the efforts of CMAG to stabilize and maintain the Debtor's business as a going concern.  Among other things that might have contributed to a direct benefit to the Defendant's collateral were "running the Debtor's business operations on a day-to-day basis, . . . meeting with critical trade vendors to ensure a continued supply of resins and other raw materials used in the Debtor's manufacturing operations," and meeting with key customers to offer assurances of the Debtor's ability to fulfill orders.  Complaint ¶ 29.  The Defendant had an "all-asset" lien on all of the Debtor's inventory and accounts receivable, which was later amended to include the Debtor's machinery and equipment.[19]  A secured creditor's "all-asset" lien can create difficulty in separating which services provided a direct benefit to the collateral and which provided the generalized benefits of

---

[19]  See In re Felt Mfg., Doc. No. 5 (describing the Debtor's pre-petition financing arrangements in the first cash collateral motion).

chapter 11 without expanding the direct benefit definition under § 506(c). However, the Court finds that the complaint, supplemented with the time records, states enough for the Plaintiff to proceed on the CMAG portion of the surcharge action. Accordingly, the Court denies the Defendant's motion to dismiss as it relates to the Plaintiff's surcharge claim for CMAG's fees and expenses.

### ii. Foley Hoag

As stated above in section III.D.2.a.ii, the complaint alleges several categories of services provided by Foley Hoag, including work to "formulate a sale process" for the sale of the Debtor's business that would "maximize the value of the Debtor's assets." Complaint ¶ 47. The firm fielded calls from buyers, prepared confidentiality agreements with potential buyers, and maintained regular communication with the Committee and the Defendant to select an investment banker. Id. ¶¶ 48-49. The complaint also alleges that the groundwork for the sale of the Debtor's business was successful. The Debtor outperformed the projections in its cash collateral budget, held on to a majority of its customers, and exceeded total projected sales during the first month of the chapter 11. Id. ¶¶ 50-51. Eventually, "[s]ubstantially all of the operational assets of the Debtor were sold in . . . April 2006 for approximately $39 million, as a result of which CapSource's secured claim was satisfied in full." Id. ¶ 52. The complaint alleges this was possible because "the Debtor's business remained viable" due to the work done by the professionals from the petition date to the appointment of the Trustee, who later sold the Defendant's collateral at a price greater than its secured claim. Id. ¶ 53-54.

The Court believes the complaint alleges enough of a direct benefit to the Defendant to survive a motion to dismiss. The complaint details facts that support plausible relief for some

38

portion, if not all, of the costs and expenses.  The complaint draws a factual nexus between the services provided to help manage the sale of the business and assets on a going concern basis and the actual successful sale (and full satisfaction of the secured claim).  Accordingly, the Court denies the Defendant's motion to dismiss as it relates to the Plaintiff's surcharge claim for Foley Hoag's fees and expenses.

### iii.  Bernstein Shur

As stated above in section III.D.2.a.iii, the complaint explained that Bernstein Shur's work "conferred a benefit on CapSource and its collateral" because its services "ensure[d] the continued operation of the Debtor as a going concern" and included motions on insurance financing, cash collateral, funding employee wages, and equipment leases.  Complaint ¶ 59, 61. The services eventually "permit[ted] the Debtor's ultimate sale as a going concern."  Id. ¶ 61. Although the potential for duplication of services between Bernstein Shur and Foley Hoag exists, the time records and factual allegations in the complaint support a plausible claim for a direct benefit from Bernstein Shur's services.  Accordingly, the Court denies the Defendant's motion to dismiss as it relates to the Plaintiff's surcharge claim for Bernstein Shur's fees and expenses.

## IV.    CONCLUSION

In summary, the Court finds only that the Plaintiff's complaint pleaded a plausible surcharge claim for the professionals on some or all of the fees and expenses requested.  The Court expresses no opinion on the ultimate success of the allegations; discovery will shed further light on the claim and the Plaintiff will be put to his burden of proof under § 506(c).

For the reasons stated above, the Court will grant in part and deny in part the Motion with respect to the surcharge claims of both the Debtor's professionals, CMAG, Foley Hoag, and Bernstein Shur, and the Committee's professionals, Aurora, Pachulski Stang, and McLane Graf.

The Court will issue a separate order consistent with this opinion which: (1) grants the Motion with respect to all claims for a surcharge for expenses incurred after October 28, 2005; (2) denies the Motion in all other respects; and (3) directs the parties to consult with each other and contact the calendar clerk within fifteen days to schedule a pretrial conference.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Manchester, New Hampshire.


Date:   March 17, 2009                          /s/ J. Michael Deasy
                                                J. Michael Deasy
                                                Bankruptcy Judge